FILED
2021 Sep-14  AM 08:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ANTONIA POWELL,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:19-cv-00309-MHH** |
| | } | |
| **BIRMINGHAM HEART CLINIC,** | } | |
| **P.C.,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

In this employment action, Antonia Powell brings claims against her former employer, Birmingham Heart Clinic, under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.  Ms. Powell alleges that BHC employed her as a Spanish translator, scheduler, and receptionist without properly paying her.  She also alleges that when she complained to her supervisor and filed an EEOC charge of discrimination, her discipline write-ups increased until BHC fired her in October 2018.  Ms. Powell contends that her treatment constitutes unlawful discrimination and retaliation because of her national origin.  BHC has asked the Court to enter judgment in its favor on Ms. Powell's claims.  (Doc. 46).  This opinion resolves the motion for summary judgment.

1

The opinion begins with a discussion of the standard that a district court uses to evaluate motions for summary judgment. Then, consistent with the summary judgment standard, the Court identifies the evidence that the parties have submitted, describing the evidence in the light most favorable to Ms. Powell. Next, the Court discusses and resolves preliminary procedural issues raised by BHC in its motion for summary judgment. Then, the Court discusses the general analytical framework for national origin discrimination claims under Title VII and § 1981. Finally, the Court examines the parties' evidence under that framework.

I.

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

When considering a summary judgment motion, a district court must view the evidence in the record and draw reasonable inferences from the evidence in the light most

favorable to the non-moving party.  *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015).  Accordingly, the Court views the evidence in the light most favorable to Ms. Powell and draws all reasonable inferences from the evidence in her favor.

## II.

Birmingham Heart Clinic "is a locally owned medical practice group that specializes in cardiovascular care." (Doc. 47-7, p. 2, ℗ 3).  BHC has five locations in central Alabama, and it employs approximately 15 doctors.  (Doc. 47-7, p. 2, ℗℗ 2-3).  BHC is a high-volume practice; physicians there evaluate more than 300 patients per day.  (Doc. 25-1, p. 2, ℗ 7).

In January of 2015, Ms. Powell applied for a position with BHC.  (Doc. 47-1, p. 101).  Ms. Powell was born in United States to parents from Puerto Rico.  She is Hispanic. (Doc. 47-1, p. 5, tp. 12; Doc. 47-1, p. 60, tpp. 233).

Two BHC employees, Lea Jackson and Darryl, interviewed Ms. Powell.[1]  During the interview Ms. Jackson and Daryl noted that Ms. Powell was bilingual and that she would be an asset to BHC because the clinic has many bilingual patients.  Ms. Powell mentioned that she had worked as a translator and that she had been paid per translation when she did.  Ms. Jackson explained to Ms. Powell that if BHC hired her, she would be hired as a translator and a diagnostic scheduler.   Ms. Powell left the interview understanding that she would be paid both an hourly wage and a separate amount for the

---

[1] Ms. Powell gave the name Daryl in her deposition, but she could not remember Daryl's last name.

translation support she provided. BHC offered the job, and she accepted. (Doc. 47-1, pp. 16-17, tpp. 54-58).

In March of 2015, Ms. Powell began working at BHC, earning $13 an hour. Ms. Powell primarily scheduled patient appointments. When staff needed bilingual support, Ms. Powell would leave her desk, go to the front desk, patient rooms, or the billing department and translate conversations concerning appointments, billing issues, diagnoses, and other general information. Ms. Powell's supervisor, Lea Jackson, told her that she should keep a record of the translations she provided. Ms. Powell kept a log of the translations in a notebook at her desk. (Doc. 47-1, pp. 23-24, tpp. 83-86).

Shortly after she began working at BHC, Ms. Powell asked Ms. Jackson if they could discuss compensation for translating. Ms. Powell mentioned, as she had in her interview, that she would like to be paid per translation. Ms. Jackson informed Ms. Powell that she would talk with management and get back to her about that possibility. (Doc. 47-1, pp. 24-25, tpp. 89-90). Within the month, Ms. Powell again asked Ms. Jackson about separate compensation for translations. Ms. Jackson said she was working on it. (Doc. 47-1, p. 25, tpp. 91-92).

Ms. Powell worked as a diagnostic scheduler from 2015 until 2017. During her time as a diagnostic scheduler, Ms. Powell received a .25/hour raise. (Doc. 47-1, p. 103). She received a disciplinary action form on March 16, 2016. According to the form, "too many errors [were] being made at check-out when scheduling patients." (Doc. 47-1, p. 105). On

March 23, 2017, Ms. Powell received an employee appraisal in which BHC rated her as "good" in all areas except "other" where she was rated as "outstanding" for helping with translations. (Doc. 47-1, pp. 103-104). On the appraisal, Ms. Jackson wrote:

> I do not believe the errors Mita makes is due to a lack of knowledge as much as it is not paying attention to detail. . . . Mita is willing to stay and help is [*sic*] needed, or when the department is short staffed. However, there are many times during the day that Mita is missing from the department when there is a patient waiting. . . . Mita has been moved many times by management. Some because of conflicts with other staff members. It has gotten better. She is willing to help others when needed. . . . Mita spends too much time on her cell phone. . . . We appreciate that you are fluent in Spanish, and willing to assist not only with patients over the phone, but also assisting the doctors in clinic, front office, and billing.

(Doc. 47-1, pp. 103-104).

BHC offered Ms. Powell a position as a front desk receptionist in June of 2017. Ms. Jackson informed Ms. Powell that it was hard to keep the front desk staffed, but she believed that Ms. Powell would be the best candidate for the position. (Doc. 47-1, pp. 31-32, tpp. 117-18). Ms. Powell, excited for the opportunity, responded by email to Tonya White, BHC's practice administrator, stating: "I am really excited about the opportunity. . . . While speaking with Lea yesterday she assured me that within three months of beginning to train and work I would be receiving a raise in pay. . . . I also know that lea [*sic*] has been looking into the compensation of me translating for our BHC patients. I feel that I provide a great benefit to BHC and being able to translate for our Spanish patients and making them feel comfortable and welcomed. I hope that you and lea [*sic*] can let me know the status." (Doc. 47-1, p. 108).

Ms. Powell worked with two other receptionists at the front desk, Valerie Jeffries, a Black woman with five-years' experience as a BHC receptionist, and Brittany Martin, a Caucasian woman with six-months' experience as a BHC receptionist. (Docs. 47-1, p. 31, tp. 116; 47-3, p. 3, tp. 6; 47-4, p. 5, tp. 14).[2]  In addition to their primary responsibilities, each receptionist had independent assignments. Ms. Powell's independent assignment was to provide bilingual support throughout the clinic. When Ms. Powell helped with translations, Ms. Jeffries and Ms. Martin handled her duties at the front desk until she returned. (Doc. 47-10, p. 2, ⁋ 5).

Over time, Ms. White and Ms. Jackson met with the front desk receptionists to discuss their work flow. Ms. Powell, Ms. Jeffries, and Ms. Martin decided to shift their responsibilities. Ms. Powell became responsible for the initial sign-in process—she took the patient sign-in sticker, placed it in the proper location, and indicated in BHC's computer system that the patient had arrived. (Doc. 47-8, pp. 4-5, ⁋ 21). The other receptionists handled insurance verification and copays and patient chart information. (Docs. 47-1, p. 38, tp. 145; 47-3, p. 10, tp. 34).

Around this same time, Ms. Powell asked by email for a meeting with Ms. Jackson and Ms. White to discuss her pay. On November 13, 2017, Ms. White called Ms. Powell

---

[2] During her April 24, 2020 deposition, Ms. Jeffries testified that she had worked as a front desk receptionist for eight years. During her May 1, 2020 deposition, Ms. Martin testified that she had been with BHC for three years and five months. Ms. Powell began working at the front desk in June 2017, so when she began, Ms. Jeffries had five-years' experience, and Ms. Martin had six-months' experience.

to her office and told her that asking for compensation for translation was "crap."  Ms. Powell told Ms. White that she did not feel that asking for more compensation was crap because Ms. Powell believed she was doing a good job interpreting for the company and the doctors.  Ms. White explained that Ms. Powell was not bringing more money into the company, that she collected fewer copays than the other receptionists, and that her translating was not that special because the office could use Google Translate instead. (Doc. 47-1, p. 38, tpp. 142-145; Doc. 47-1, p. 61, tpp. 235-236).  Ms. Powell went back to her desk and wrote Ms. White's remarks in her translation log notebook.  (Doc. 47-1, p. 110).

After the meeting, Ms. Powell went to Ms. Jackson and "probably" expressed that she felt bullied and that she was discriminated against.  She explained that she felt uncomfortable translating emails, that she felt she was being pulled away from her work, and that she was asked to do things she was uncomfortable doing.  Ms. Powell voiced other concerns.  For instance, she did not like that when she tidied up the kitchen area or warmed her lunch, Ms. Jackson and Angela Bell made comments about housekeeping.  Ms. Powell left the meeting in tears after Ms. Jackson laughed at her.  (Doc. 47-1, p. 42, tpp. 158-162; Doc. 47-1, pp. 44-45, tpp. 169-72).

In Ms. Powell's 2017 annual employee appraisal, which Ms. Powell signed on April 26, 2018, Ms. Jackson noted that Ms. Powell was making fewer mistakes.  Ms. Jackson rated Ms. Powell's quality of work, knowledge of job, reliability and dependability, and

initiative as "very good."  Ms. Jackson stated:  "Mita has done a tremendous job correcting the errors that plagued her within the last year. . . . Mita has minimized her mistakes and is pulling her own weight, there has been great improvement. . . . The last year Mita has displayed our CORE VALUES, She is a hard worker, I would encourage her to be more positive in the midst of adversity. She excels in Adaptability in regards to her willingness of Translation.  Mita is respectful and a team player[.]"  (Doc. 47-1, pp. 111-12).

Shortly after her appraisal, on April 30, 2018, Ms. Powell made a check-in error. Ms. Powell's disciplinary action form indicates that she did not check a patient in.  As result, the patient sat in the lobby for more than three hours.  As the patient sat waiting, Ms. Powell clocked out and locked the doors.  Ms. Powell received a "Written Warning/Reprimand" on May 1, 2018.  (Doc. 47-1, p. 113).

Again, on May 22, 2018, Ms. Powell made a check-in error, causing an extended wait time for a patient.  On a disciplinary action form, Ms. Jackson explained that a patient arrived about 9:45 a.m. for his 9:30 a.m. appointment.  Ms. Powell pulled his label and highlighted his name, but she did not check the patient in on the tracking que.  The patient approached the front desk at 12:30 p.m., almost three hours later, to ask Ms. Martin about his wait time.  By that time, the patient had been marked as a no show.  Ms. Powell received a "FINAL Written Warning/Reprimand" for the May 22, 2018 incident.  Ms. Jackson wrote:

> This is not the first time that a patient has been made to wait for hours unnecessarily, nor is it the first time we have addressed this with you (the most

recent being a few weeks ago).  It is causing bad patient care and patient
dissatisfaction. There will be no further warnings or write ups given.  If there
is another situation like this your employment will be terminated immediately.

(Doc. 47-1, p. 114).

Ms. Powell felt that she was being disciplined for the errors because she had
complained that she was not being paid for her translations.  Ms. Powell filed a charge of
discrimination with the EEOC on May 25, 2018.  In her charge she stated,

I am a Hispanic employee of Birmingham Heart Clinic, P.C.  I work as a
scheduler and asked to perform additional work duties.  I speak Spanish and
the company assigns me additional translating duties not assigned to other
employees.  For 3 years, I was promised that I would be compensated for these
additional duties. Recently I met with the office administrator about the issue
who respond that is 'crap', I am paid to do whatever is asked from the hours
of 8:00 [to] 5:00.  I was insulted by this treatment.  I was then informed
translating requires no special skill and can be easily completed on [G]oogle
translate.  I have been to spy on doctors by translating their email containing
Spanish.  However, to my knowledge no other employees are given the
translation assignments.  Thus, based on my national origin I am being
subjected to discrimination.  When I objected to the additional job duties. I
am now threatened with termination for my opposition to discriminatory
assignments without pay.  For the first time in 3 years, I have been issued
written discipline for patient waiting, in a busy practice my co-workers are
not being given the same discipline when their errors result in patients being
overlooked.  Moreover, I am paid less money than non-Hispanic co-workers.

(Doc. 47-2, p. 59).

About three months after she filed her charge with the EEOC, Ms. Powell made
another check-in error.  Ms. Powell marked the patient as "ready for clinic" but did not
mark him as "checked in."  Seeing this discrepancy, the staff in the clinic called the front
desk and asked if the patient was present.  Ms. Martin said the patient was a no show.  After

hanging up with the clinic staff, Ms. Martin called the patient's name twice, but he did not answer because he was in the restroom. About two hours later, Ms. Martin heard the patient complaining to another patient about the wait time, so she called him up and discovered the error. Because Ms. Martin and Ms. Powell contributed to the error, Ms. White decided to give Ms. Powell one more chance. Therefore, both women were counseled, and a copy of the incident report was placed in both of their files. (Doc. 47-1, pp. 115-17).

On October 1, 2018, Ms. Powell received an "Employment Termination" on a disciplinary action form for a mistake she made on September 27, 2018. The form indicates that a patient checked in at 12:45 p.m., but Ms. Powell did not mark him as checked in. The patient was not seen until about four hours later at 4:30. Ms. White noted the mistakes from May 1 and 22, 2018, and the mistake from September 7, 2018. She wrote, "[a]s discussed above, on September 27, 2018, Mita failed to properly check in a patient resulting in the patient waiting in the lobby for over three hours. Given the repeat [*sic*] nature of the serious conduct, and after final warning, the decision has been made to terminate her employment." (Doc. 47-1, p. 118).

The EEOC issued a "Dismissal and Notice of Rights" to Ms. Powell on November 21, 2018. (Doc. 1-1, pp. 1-2). Ms. Powell filed this suit within 90 days on February 20, 2019. (Doc. 1). She asserts national origin claims against BHC under Title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. § 1981.

III.

Before reaching the merits of Ms. Powell's discrimination and retaliation claims, we evaluate BHC's arguments that she did not properly exhaust some of her Title VII theories and that she cannot assert a § 1981 claim for national origin discrimination.

<u>Administrative Exhaustion</u>

Ms. Powell's Title VII discriminatory and retaliatory discharge claims fail as a matter of law because she did not exhaust those claims administratively. Generally, before filing a lawsuit in federal court, a Title VII plaintiff must file a timely administrative charge with the EEOC. *Duble v. FedEx Ground Package Sys., Inc.*, 572 Fed. Appx. 889, 892 (11th Cir. 2014). There is a narrow exception to the general rule for Title VII retaliation claims. When a Title VII plaintiff asserts a retaliation claim after she files a Title VII lawsuit based on a properly exhausted discrimination claim, then the plaintiff may proceed with her retaliation claim without filing a new EEOC charge to exhaust the claim. If there is no pending Title VII claim in a federal court action "to which the retaliation claim may attach," then a plaintiff may not pursue an unexhausted retaliation claim. *Duble*, 572 Fed. Appx. at 892-93 (citing *Gupta v. E. Tex. State Univ.*, 654 F.2d 411, 413 (5th Cir. 1981)) (holding that "the district court has ancillary jurisdiction to hear such a [retaliation] claim when it grows out an administrative charge that is properly before the court").

Here, Ms. Powell filed an administrative charge with the EEOC on May 25, 2018, approximately four months before BHC terminated her.  (Doc. 1-1).  Ms. Powell identified as the general reasons for her charge national origin discrimination and retaliation.  (Doc. 1-1, p. 3).[3]  Ms. Powell alleged specifically that BHC discriminated against her in her work assignments in that she was given "additional translating duties not assigned to other employees" and that BHC retaliated against her by writing her up for overlooking patients after she complained internally for not being paid for her translating responsibilities.  (Doc. 1-1, p. 3).  Before she filed her May 25, 2018 EEOC charge of discrimination, Ms. Powell had received written disciplinary action warnings on May 1 and May 22, 2018.  (Doc. 47-2, p. 59).

After Ms. Powell filed her EEOC charge, BHC issued another written warning to her on September 27, 2018 and terminated her on October 1, 2018. (Doc. 47-1, p. 118). In this action, she alleges that her termination was discriminatory and retaliatory, but she did not amend her EEOC charge or file a new one to exhaust a claim regarding her termination after BHC fired her.  (Doc. 25, p. 5, ℙ 25).  Because Ms. Powell did not file her lawsuit against BHC until February of 2019, about four months after her termination, there was no federal action to which her claim concerning her termination could attach.  Consequently, Ms. Powell's claims for discrimination and retaliation concerning her September 27, 2018

---

[3] Ms. Powell also checked the box for sex discrimination, but she has not pursued a claim for sex discrimination in her amended complaint.  (Doc. 1-1, p. 3; Doc. 25).

write-up and October 1, 2018 her termination are not properly before the Court because she did not exhaust those claims administratively.

Ms. Powell properly exhausted her Title VII claims for discriminatory work assignments and for retaliatory pre-termination discipline, so those claims are not barred procedurally.  In addition, there in no exhaustion requirement for § 1981 claims, so the exhaustion analysis does not preclude Ms. Powell's § 1981 discriminatory and retaliatory discharge claims.

### § 1981 National Origin Claims

BHC argues that Ms. Powell's § 1981 claims fail because, according to BHC, § 1981 claims may rest only on race discrimination, not national origin discrimination.  (Doc. 25, pp. 6-9).[4]  The Court is not persuaded.

Though there is not a separate cause of action under § 1981 for national origin discrimination, nation origin discrimination claims akin to race discrimination claims may proceed under § 1981.  In *Saint Francis Coll. v. Al-Khazraji*, the Supreme Court held that the respondent could assert a claim under § 1981 if he could prove that he was subjected to intentional discrimination because "he was born Arab."  481 U.S. 604, 613 (1987). The Supreme Court explained:

---

[4] Section 1981 guarantees to all citizens "the same right to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ."  42 U.S.C. § 1981(a).

> Based on the history of § 1981, we have little trouble in concluding that Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics.  Such discrimination is racial discrimination that Congress intended § 1981 to forbid, whether or not it would be classified as racial in terms of modern scientific theory. The Court of Appeals was thus quite right in holding that § 1981, "at a minimum" reaches discrimination against an individual "because he or she is genetically part of an ethnically and physiognomically distinctive sub-grouping of homo sapiens." It is clear from our holding, however, that a distinctive physiognomy is not essential to qualify for § 1981 protection.  If respondent on remand can prove that he was subjected to intentional discrimination based on the fact that he was born Arab, rather than solely on the place or nation of his origin, or his religion, he will have made out a case under § 1981.

*Saint Francis*, 481 U.S. at 613.

Similarly, in *Donaire v. NME Hosp.*, the Eleventh Circuit held that a "[p]laintiff's allegation that he or she was subjected to intentional discrimination because of his or her "ancestry or ethnic characteristics" satisfies the pleading requirements of section 1981." *Donaire v. NME Hosp., Inc.*, 27 F.3d 507, 509 (11th Cir. 1994) (allowing § 1981 claim that hospital "discriminated against 'foreign-born' physicians," "reject[ing] conclusion that Filipinos cannot be a protected class under § 1981," and "[t]reating the case as one claiming discrimination against Dr. Donaire because of his Philippine ancestry");[5] *see also Bullard*

---

[5] In support of its holding, the Eleventh Circuit provided the following citations:  "*Saint Francis College v. Al Khazraji,* 481 U.S. 604, 613, 107 S. Ct. 2022, 2028, 95 L.Ed.2d 582 (1987) (holding that plaintiff could maintain an action under section 1981 for racial discrimination based on plaintiff's status as an Arab). *See also Shaare Tefila Congregation v. Cobb,* 481 U.S. 615, 617–18, 107 S. Ct. 2019, 2021–22, 95 L.Ed.2d 594 (1987)(individual may maintain section 1981 claim based on individual's status as a Jewish person); *Malhotra v. Cotter& Co.,* 885 F.2d 1305, 1308 (7th Cir. 1989)(section 1981 redresses intentional discrimination because of Indian ancestry); *MacDissi v. Valmont Indus.,* 856 F.2d 1054, 1060 (8th Cir. 1988) (plaintiff stated viable section 1981 claim by alleging intentional discrimination based on

*v. OMI Ga., Inc.*, 640 F.2d 632, 634 (5th Cir. Unit B 1981) (stating that, "[i]n some contexts, 'national origin' discrimination is so closely related to racial discrimination as to be indistinguishable.") (citing *Spiess v. C. Itoh & Co.*, 408 F. Supp. 916, 928 n. 17 (S.D. Tex. 1976)); *Alvarado v. El Paso Indep. Sch. Dist.*, 445 F.2d 1011 (5th Cir. 1971) (holding that complaint by Mexican-Americans alleging racial and ethnic discrimination "clearly states a cause of action" under § 1981).[6]

Thus, Ms. Powell may state a claim under § 1981 because she contends that BHC treated her differently from other employees because of her Hispanic ancestry or ethnic characteristics. Hispanic is defined as, "of, or relating to, or being a person of Latin American descent and especially of Cuban, Mexican, or Puerto Rican origin living in the U.S." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/Hispanic. Ms. Powell identifies as Hispanic—being born in the

---

Lebanese descent)." *Donaire*, 27 F.3d at 509. The Eleventh Circuit concluded: "These cases tend to support the view that Filipinos can be a protected class." 27 F.3d at 509.

In *Saint Francis College*, the United States Supreme Court held that §1981's protections do not extend to discrimination claims based "solely on the place or nation . . . of origin." *Saint Francis College*, 481 U.S. at 613. But evidence of national origin discrimination may be relevant to a claim for racial discrimination under§ 1981. *See Sinai v. New England Tel. and Tel. Co.*, 3 F.3d471, 474–75 (1st Cir. 2003) (upholding a jury finding of racial discrimination—Jewish/Hebrew—under §1981 despite defendants' objections that the only evidence of discrimination was disparaging remarks about the plaintiff's national origin—Israeli—because "national origin could be used, together with other evidence, to arrive at a conclusion vis-a-vis race discrimination"); *Aramburu v. Boeing Co.,*112 F.3d 1398, 1411 (10th Cir. 1997) (plaintiff's "claim of discrimination based on his Mexican-American ancestry . . . fall[s] within section 1981's protection against racial discrimination").

[6] In *Bonner v. City of Prichard, Alabama*, the Eleventh Circuit Court of Appeals adopted as binding precedent decisions the Fifth Circuit Court of Appeals issued before the close of business on September 30, 1981. 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

United States to Puerto Rican parents. (Doc. 47-1, p. 5, tp. 12; Doc. 47-1, p. 60, tpp. 233; *see also* Doc. 25, p. 2, ¶ 6). Ms. Powell contends that BHC selected her for specific assignments, did not properly compensate her as agreed or at a rate commensurate with her co-employees, and disciplined her differently because she is of Hispanic origin. (Doc. 25, pp. 6-7). Under *St. Francis* and *Donaire*, she may pursue a § 1981 claim.

## IV.

Ms. Powell's Title VII claim for discriminatory work assignments and retaliatory pre-termination discipline rests on circumstantial evidence.[7] So do her § 1981 claims for discriminatory work assignments, retaliatory pre-termination discipline, and discriminatory and retaliatory termination. Therefore, the analytical framework that governs these claims is the same. *Standard v. A.B.E.L. Servs. Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (explaining that courts analyze § 1981 claims and Title VII claims similarly because "both statutes have the same requirements of proof and use the same analytical framework") (abrogated on other grounds).[8] Because the scope of Ms. Powell's

---

[7] "[O]nly the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of [] discrimination." *Jefferson v. Sewon Am., Inc.,* 891 F.3d 911, 922 (11th Cir. 2018). Ms. Powell testified about remarks concerning housekeeping that she believes evidence discrimination. (Doc. 47-1, p. 54, tpp. 208-09). Statements about housekeeping may be circumstantial evidence of discriminatory intent, but the statements are not direct evidence of discriminatory animus.

[8] Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). "When a plaintiff claims that she was fired due to her [national origin], she may rely on two legal theories to prove unlawful discrimination: (1) the

§ 1981 claims is broader than the scope of her Title VII claims, the Court will focus on Ms. Powell's § 1981 claims.  If those claims fail as a matter of law, then her Title VII claims necessarily fail too.

## Employment Discrimination

Ms. Powell alleges that BHC discriminated against her because of her Hispanic origin because BHC selected her to interact with Spanish-speaking patients.  (Doc. 25, p. 6).  She contends that BHC asked only her to translate private physician emails and documents.  (Doc. 25, p. 4).  Ms. Powell asserts that BHC agreed to compensate her for her translations, but the compensation never materialized.  (Doc. 25, p. 3, ¶¶ 15-16).  Finally, she contends that similarly situated non-Hispanic coworkers made mistakes just as she did, but they were not disciplined or fired.  (Doc. 25, p. 5).

---

"but for" causation or "single-motive" theory; and (2) the "mixed-motive" theory."  *Williams v. Housing Auth. of Savannah, Inc.*, 834 Fed. Appx. 482, 487 (11th Cir. 2020).  In her complaint, Ms. Powell did not indicate whether she alleges a single-motive or a mixed-motive Title VII discrimination claim.  She was under no obligation to plead one or the other in her complaint.  *Williams*, 834 Fed. Appx. at 489.  The parties' summary judgment briefs do not suggest that Ms. Powell is pursuing a mixed-motive discrimination claim.  Accordingly, the Court analyzes Ms. Powell's claim as a single-motive Title VII discrimination claim.  *See Williams*, 834 Fed. Appx. at 487–89.

If Ms. Powell had asserted a mixed-motive Title VII discrimination claim, then the Court would have had to use a different analysis for Ms. Powell's Title VII discrimination and her § 1981 discrimination claims.  Courts evaluate Title VII mixed-motive claims under *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227 (11th Cir. 2016), rather than *McDonnell Douglas*.  Under § 1981, a plaintiff must establish that that race was the but-for cause of her injury; the mixed-motive option available to plaintiffs for Title VII discrimination claims is not an option for § 1981 discrimination claims.  *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009 (2020).

On the record in this case, Ms. Powell's allegations concerning discriminatory work assignments cannot support a claim of intentional discrimination based on her Hispanic ancestry.  BHC asked Ms. Powell to translate for Spanish-speaking patients because Ms. Powell speaks Spanish.  The ability to speak Spanish is not uniquely tied to Hispanic ancestry.  Many people of many races and ethnic backgrounds speak Spanish fluently, and people of Hispanic ancestry are not necessarily fluent in the Spanish language.  On the record before the Court, Ms. Powell's claim for discriminatory work assignments based on her translation responsibilities is not sufficiently rooted in the discrimination that Congress sought to address under § 1981.

Ms. Powell relies on circumstantial evidence to support her allegations that she was compensated and disciplined differently because of her national origin.  A plaintiff who relies on circumstantial evidence to prove employment discrimination may satisfy either the burden shifting framework that the Supreme Court established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or the convincing mosaic standard of *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011) (*en banc*).

To make out a *prima facie* case of discrimination under *McDonnell Douglas*, a plaintiff must demonstrate that she belongs to a protected class, she was qualified for her job, and she was subjected to an adverse employment action.  She also must demonstrate that her employer treated similarly situated employees outside of her class more favorably than her.  If a plaintiff alleges, as Ms. Powell does, that her employer treated similarly

situated individuals differently in matters of employee discipline, then the plaintiff must show that her comparators are similar in all material respects. *Lewis v. City of Union, City, Georgia*, 918 F.3d 1213 (11th Cir. 2019).

Under *McDonnell Douglas*, if a plaintiff establishes a *prima facie* case, then the burden shifts to the employer to show it had a legitimate non-discriminatory reason for the adverse employment action.

The burden then returns to the plaintiff to show that the employer's proffered reason for the employment action is pretext for unlawful discrimination. *Lewis*, 918 F.3d at 1221. "To show pretext, the plaintiff must identify weaknesses, inconsistencies, or contradictions in the employer's articulated legitimate reasons for its action so that a reasonable factfinder would find them unworthy of credence." *McPhie v. Yeager*, 819 Fed. Appx. 696, 698 (11th Cir. 2020).

"'[E]stablishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion' in Title VII cases." *Flowers v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015) (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). "The critical decision that must be made is whether the plaintiff has 'create[d] a triable issue concerning the employer's discriminatory intent.'" *Flowers*, 803 F.3d at 1336 (quoting *Smith*, 644 F.3d at 1328); *see also Lewis*, 918 F.3d at 1185 (same). To carry her burden, a plaintiff may identify a "'convincing mosaic'" of circumstantial evidence "that

demonstrates, among other things, (1) 'suspicious timing, ambiguous statements . . ., and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis*, 934 F.3d at 1185 (quoting *Silverman v. Bd. Of Educ. Of City of Chi.*, 637 F.3d 729, 733-34 (7th Cir. 2011)).

Ms. Powell's theories of discriminatory pay and discipline fail as a matter of law under the *McDonnell Douglas* framework because she cannot establish a prima facie case. Ms. Powell satisfies the first two elements of a *McDonnell Douglas prima facie* case because she is a member of a protected class, and she was qualified for her position. As for the third element, Ms. Powell suffered an adverse employment action when BHC terminated her, and, for purposes of this analysis, the Court assumes that BHC's failure to provide additional compensation for Ms. Powell's translations rises to the level of an adverse employment action.[9]

---

[9] Viewing the evidence in the light most favorable to Ms. Powell, the Court accepts her assertion that BHC agreed to compensate her for her translations and then reneged. Absent the agreement, the failure to provide additional compensation for translations would not necessarily rise to the level of an adverse action because there is no evidence that Ms. Powell had to work extra hours or that she otherwise was subject to additional burdens because she spent some of her workday translating for Spanish-speaking patients. There is not sufficient evidence in the record to allow the Court to conclude that an employee who translates for an employer necessarily -- by law, regulation, or some other device -- should be paid separately for the service. The record does not indicate that Ms. Powell spent so much of her workday translating that she was improperly classified as a scheduler or a receptionist.

The Court notes that Ms. Powell acknowledged in her deposition that BHC had not agreed to pay her per translation, but Ms. Jackson had indicated that she would look into Ms. Powell's request to be compensated when she translated for BHC. (Doc. 47-1, p. 18, tpp. 62-63). The evidence shows that Ms. Powell received translation assignments because she asked for the assignments, believing she would be paid accordingly. Ms. Powell received only her hourly wage because she accepted BHC's offer to work

Ms. Powell's *prima facie* case falters because she has not demonstrated that BHC treated similarly situated employees outside of her class more favorably than her.  With respect to her discriminatory pay theory, Ms. Powell has not identified other employees to whom BHC provided additional compensation when they performed tasks that were outside of their routine job responsibilities.  For purposes of BHC's summary judgment motion, the Court accepts Ms. Powell's testimony that BHC promised to pay her separately per translation and then did not follow through, but that constitutes only a broken promise.  The broken promise is not tantamount to intentional discrimination under the *McDonnell Douglas* framework if Ms. Powell cannot point to other employees outside of her class who received better treatment.  As noted, there is no evidence that Ms. Powell had to work longer hours or that she otherwise was burdened because of the time she devoted to translations.  From the perspective of *McDonnell Douglas*, a broken promise standing alone does not establish unequal treatment.

As for her termination, Ms. Powell points to two other receptionists, Valerie Jeffries and Brittany Martin, as comparators.  Ms. Jefferies and Ms. Martin are non-Hispanic, held the same position as Ms. Powell, reported to the same supervisor, and were evaluated using the same appraisal and disciplinary policy.  Ms. Powell contends that Ms. Jefferies and Ms. Martin made mistakes as receptionists for BHC, but the company did not fire either of

---

as a scheduler without an agreement confirming that she would be paid separately for translations.  (Doc. 47-1, pp. 16-18, tpp. 54-63).

them.  Despite these similarities, the Court is not persuaded that Ms. Jefferies and Ms. Martin are adequate comparators under *Lewis*.[10]

Evaluation of Ms. Jefferies and Ms. Martin as comparators is a bit challenging because their personnel records are not in the evidentiary record.  Testimony from Ms. Jefferies, Ms. Martin, and Ms. Powell indicates that each received comments in her 2017 annual appraisal concerning errors, but none of the receptionists received a disciplinary warning for errors during the 2017 appraisal year.  (Docs. 47-3, p. 7, tpp. 21-23; 47-4, p. 7, tpp. 21-23).  Ms. Powell received her 2017 annual appraisal, in which she received a raise from $13.25 to $15.00 per hour, in April of 2018.  (Doc. 47-1, pp. 111-12).  It was not until Ms. Powell made an error that caused a patient to wait for more than three hours in May of 2018 that she received a written warning.  (Doc. 47-1, pp. 113).

To establish that Ms. Jefferies and Ms. Martin are proper comparators, Ms. Powell must produce evidence to show that "the quantity and quality" of the receptionists' errors were nearly identical to hers.  *See Wolfe v. Postmaster Gen.*, 488 Fed. App. 465, 468 (11th

---

[10] In *Lewis*, the Court of Appeals listed these non-exclusive examples of what makes a comparator similarly situated:  "will have engaged in the same basic conduct (or misconduct) as the plaintiff;" "will have been subject to the same employment policy, guideline, or rule as the plaintiff;" "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff;" and "will share the plaintiff's employment or disciplinary history."  *Lewis*, 918 F.3d at 1227–28.  "In short, as its label indicates–'all material respects'–a valid comparison will turn not on formal labels, but rather on substantive likenesses.  To borrow phrasing from a recent Supreme Court decision, a plaintiff and her comparators must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'"  *Lewis*, 918 F.3d at 1228 (quoting *Young v. United Parcel Service, Inc.*, 135 S. Ct. 1338, 1355 (2015)).

Cir. 2012).  To carry her burden, Ms. Powell relies on a declaration that Dr. Settle provided to her.  (Doc. 25-1, pp. 1-3).

After she filed this lawsuit, Ms. Powell spoke with Dr. Settle about her termination. Dr. Settle was a cardiologist with BHC from February 2005 until December 29, 2017.[11] Ms. Powell told Dr. Settle that BHC fired her because she did not check in a patient properly.  She explained that Ms. Martin and Ms. Jeffries made the same mistakes that she had made, but BHC did not fire them.  (Doc. 47-1, p. 58, tpp. 224-225).  Dr. Settle prepared a declaration for Ms. Powell in which he acknowledged that he was not Ms. Powell's direct supervisor but noted that he observed and worked with her.  (Doc. 25-1, p. 1, ¶¶ 2-5).  He stated:

> I understood that Ms. Powell was terminated for improperly registering a patient causing the patient to experience an extended wait time. . . . The non-Hispanic front desk personnel such as Valerie [Jeffries] and Brittney [Martin] routinely failed to properly register patients and/or forgot patients that had been registered leading to extremely long wait times.  I treated patients that experienced wait times attributable to the non-Hispanic front desk employees who forgot patients or improperly registered them.  Despite multiple occurrences these non-Hispanic personnel were not terminated.  A double standard applied to Ms. Powell when her non-Hispanic colleagues made identical errors and remained employed.

(Doc. 25-1, p. 2, ¶¶ 8, 10-12).

---

[11] As discussed below, Dr. Settle prepared two declarations in this case, the first for Ms. Powell and the second for BHC.  (Docs. 25-1, 47-11).  The first declaration indicates that Dr. Settle was affiliated with BHC from 2005-2018.  (Doc. 25-1, p. 1, ¶ 2).  The second states that his affiliation was from 2005-2017. Dr. Settle clarified in his second declaration that he did not review dates carefully when he prepared the declaration for Ms. Powell.  (Doc. 47-11, p. 2, ¶ 3).  Although, Ms. Powell attempts to discredit Dr. Settle's second declaration with a declaration of her own, she does not dispute that Dr. Settle was affiliated with BHC until December of 2017.  (Doc. 52, pp. 2, 12; Doc. 53-1).

On its face, Dr. Settle's first declaration helps Ms. Powell, but Dr. Settle provided another declaration to BHC. (Docs. 25-1; 47-11, pp. 1-9). The two declarations are not irreconcilable. Read together, Dr. Settle attests that he worked part-time during the first six months of Ms. Powell's tenure as a receptionist, and he ended his affiliation with BHC in December of 2017. (Doc. 47-11, pp. 2-3). He explains that Ms. Powell translated for his Spanish-speaking patients but that he called on her for help approximately once every six months. (Doc. 47-11, p. 3). Dr. Settle acknowledges that he did not work at BHC in 2018, so he had no personal knowledge of the circumstances surrounding Ms. Powell's disciplinary warnings or discharge in 2018. (Doc. 47-11, p. 3). Absent personal knowledge of the circumstances surrounding Ms. Powell's disciplinary warnings and her termination, Dr. Settle cannot compare her mistakes to the occasions on which Ms. Jeffries or Ms. Martin failed to properly register a patient. Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). Based on his conversation with Ms. Powell, Dr. Settle understood that she was terminated for failing to register one patient properly. (Doc. 47-1, p. 3). That understanding is not based on personal knowledge, and it is contrary to the undisputed fact that, beginning in May of 2018, Ms. Powell caused several patients to have extended waits because of her mistakes. Ms. Powell cannot rely on Dr. Settle's

testimony to establish that Ms. Jefferies and Ms. Martin were treated more favorably than her.[12]

Ms. Powell has offered no other evidence that would allow the Court to make the detailed comparison that *Lewis* requires. Ms. Powell explained there were times where patients waited because they were not checked-in properly, but she could not provide details about those instances. She stated that, "it happened to everyone . . . we checked in 400 patients a day . . . so it was bound to happen to somebody." (Doc. 47-1, p. 56, tpp. 214-15). Ms. Powell also testified: "It happened periodically. I don't remember specific time, date or person." (Doc. 47-1, p. 56, tp. 216). Ms. Powell testified that Ms. Jeffries skipped a patient once, but Ms. Powell did not know how long the patient had to wait. (Doc. 47-1, p. 57, tpp. 217-18). Ms. Martin and Ms. Jeffries testified that there were errors that led to extended wait times for patients, but that neither had made that type of error herself. (Docs. 47-2; 47-3).

When BHC terminated Ms. Powell, her disciplinary record reflected at least four write ups, three for extended wait times for patients. (Doc. 47-1, pp. 105, 113-14, 118). After a mistake in May of 2018 caused a second patient to wait more than three hours, BHC advised Ms. Powell in writing:

> This is not the first time that a patient has been made to wait for hours unnecessarily, nor is it the first time we have addressed this with you (the most recent being a few weeks ago). It is causing bad patient care and patient

---

[12] Birmingham Heart Clinic filed a motion to strike Ms. Powell's affidavit concerning Dr. Settle's second declaration. (Docs. 53-1, 54). Given the Court's analysis, the motion to strike is moot.

> dissatisfaction.  There will be no further warnings or write ups given.  If there
> is another situation like this your employment will be terminated immediately.

(Doc. 47-1, p. 114).  Ms. Powell and Ms. Martin both were disciplined for a mutual mistake

made on September 7, 2018 that caused a patient a long wait.  BHC's records reflect that

Ms. Powell did not properly check the patient in, and Ms. Martin overlooked the patient

who was in the restroom.  BHC investigated the issue, counseled both women, and put a

record of the incident in both of their files.  (Doc. 47-1, pp. 115-17).  This incident does

not indicate that BHC treated Ms. Powell and Ms. Martin differently; it indicates just the

opposite.  Thus, Ms. Powell's employment discrimination claim fails under the *McDonnell*

*Douglas* framework.

Ms. Powell's employment discrimination claim does not fare better under the

convincing mosaic standard.  Other than the evidence that the Court already has discussed,

Ms. Powell relies on her testimony that Ms. Jackson and another employee made comments

about "housekeeping" when she cleaned the breakroom fridge or heated her food.  (Doc.

47-1, pp. 42-43, tpp. 161-63).[13]  To be sure, this is a tile and the beginning of a mosaic, but

it does not rise to the level of a convincing mosaic of circumstantial evidence in this case.

On another record, similar comments coupled with other circumstantial evidence of

discriminatory intent might yield an inference of intentional discrimination based on

---

[13] In a declaration, Ms. Jackson stated that she did not mention "housekeeping" to Ms. Powell, but she did ask her to clean the refrigerator.  Ms. Jackson stated that BHC employees had a collective responsibility to keep the break room clean.  Some employees volunteered, and she asked others on a rotating basis.  Ms. Powell was not the only person asked to clean the fridge.  (Doc. 47-8, p. 3, ⁋ 11-13).  For purposes of summary judgment, the Court accepts Ms. Powell's version of her experiences in the breakroom.

national origin, but the record is too bare here.  Consequently, the Court does not find that the circumstances that Ms. Powell has described, even taken in the aggregate and viewed in the light most favorable to her, create a convincing mosaic of circumstantial evidence of intentional discrimination.   Therefore, the Court will enter judgment in favor of Birmingham Heart Clinic on Ms. Powell's Title VII and § 1981 employment discrimination claims.

<u>Retaliation</u>

Ms. Powell contends that BHC disciplined her and terminated her in retaliation for her filing an EEOC charge.  (Doc. 25).  A plaintiff asserting a retaliation claim must establish a *prima facie* case by demonstrating that she engaged in statutorily protected activity and suffered an adverse employment action and that the adverse action was causally related to her protected activity.  *Goldsmith v. Bagby Elevator Co.,* 513 F.3d 1261, 1277 (11th Cir. 2008) (citing *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 59–71 (2006)); *see also Coutu v. Martin County Bd. of County Comm'rs,* 47 F.3d 1068, 1074 (11th Cir. 1995).  An employee engages in statutorily protected activity "if '[s]he has opposed any practice made an unlawful employment practice by this subchapter' (the opposition clause) or '[s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter' (the participation clause)."  *Clover v. Total. Sys. Servs., Inc.*, 176 F.3d 1346, 1350 (11th Cir. 1999) (quoting 42 U.S.C. § 200e-(3)(a)).  Filing an EEOC charge is protected activity.  "After plaintiff has

established the elements of a claim, the employer has an opportunity to articulate a legitimate, nonretaliatory reason for the challenged employment action as an affirmative defense to liability.  The plaintiff bears the ultimate burden of proving retaliation . . . and that the reason provided by the employer is a pretext for prohibited retaliatory conduct." *Goldsmith*, 513 F.3d at 1277 (citing *Coutu*, 47 F.3d at 1073, 1075 n. 54).

It is undisputed that Ms. Powell engaged in statutorily protected activity and that an adverse employment action occurred:  Ms. Powell filed an EEOC charge of discrimination on May 25, 2018, and she was given a written discipline warning on September 27, 2018 and then terminated on October 1, 2018.

BHC argues that Ms. Powell cannot establish that her EEOC activity caused her termination because the gap between her May 2018 charge and her October 2018 termination is too wide.  (Doc. 48, p. 30-31).  The Eleventh Circuit has held that a four-month gap between protected activity and an adverse job action is too long for a plaintiff to establish a causal connection between the two events when the plaintiff relies only on temporal proximity to prove causation.  *Thomas v. Cooper Lighting*, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007).  Consistent with *Thomas*, the nearly four-month gap between the date on which Ms. Powell filed her EEOC charge and the date that BHC fired her does not, standing alone, suffice to establish causation.  To avoid BHC's motion for summary

judgment, Ms. Powell must produce additional circumstantial evidence to support her retaliation claim.[14]

On the record before the Court, Ms. Powell has not carried her burden to identify sufficient evidence of retaliatory intent. It is undisputed that BHC gave Ms. Powell two written warnings for causing patients multi-hour waits for appointments in the three weeks before she filed her EEOC charge. The discipline that followed her EEOC charge was for the same conduct, and that conduct led to her termination. (Doc. 47-1, pp. 113-14, 118). The consistent discipline before and after Ms. Powell's protected activity prevents her from proving that BHC disciplined and terminated her because she filed an EEOC charge. Accordingly, BHC is entitled to summary judgment on Ms. Powell's retaliation claims.

**CONCLUSION**

Ms. Powell has not supported her claims for discrimination and retaliation with sufficient evidence to create a genuine dispute as to a material fact for a jury to resolve. For the reasons discussed above, the Court grants Birmingham Heart Clinic's motion for

---

[14] In *Thomas*, the plaintiff filed complaints with human resources on April 8 and April 11, 2005. She was terminated on July 7, 2005. The Court of Appeals concluded that, if there is a substantial delay between the protected activity and the adverse action, then to avoid summary judgment on a retaliation claim, a plaintiff must produce additional circumstantial evidence to establish causation. Otherwise, a reasonable jury could not find a causal connection between the protected activity and the adverse action. *Thomas*, 506 F.3d at 1364 ("[M]ere temporal proximity, without more, must be 'very close.'" Thus, in the absence of other evidence tending to show causation, if there is substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law.") (quoting *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001)).

summary judgment.  BHC's motion to strike is moot.  (Docs. 46, 54).  By separate order, the Court will enter judgment for BHC on Ms. Powell's claims and close the file.

**DONE** and **ORDERED** this September 13, 2021.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE